| **Mayzone, LLC v Kramer** |
|:---:|
| 2025 NY Slip Op 32101(U) |
| June 11, 2025 |
| Supreme Court, New York County |
| Docket Number: Index No. 159443/2020 |
| Judge: Lynn R. Kotler |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 8
------------------------------------------------------------------x
Mayzone, LLC,                                    **DECISION AND ORDER**
                                                 **AFTER HEARING**
                        Plaintiff(s),
                                                 INDEX NO.:    159443/2020
          -against-

Daniel Kramer and Ellen Kramer,                  Present:
                                                 Hon. Lynn R. Kotler, J.S.C.
                        Defendant(s).
------------------------------------------------------------------x

In its complaint, plaintiff Mayzone, LLC (Mayzone) alleges it incurred damages

as a result of defendants' breach of their sublease for a cooperative apartment located

at 110 Central Park South, Apt 11A, New York, New York. Defendants deny the

allegations except admit that that they entered into a sublease for the subject premises

for a two-year term commencing on May 1, 2019. In or about November 2020, plaintiff

commenced this action seeking damages from defendants for their failure to comply

with the terms and obligations under the sublease.

A bench trial was held on March 26, 2025. Erin McCarthy and Louise Holt

testified on behalf of the plaintiff. Defendants did not call any witnesses. The issue

before the court is whether plaintiff mitigated its damages pursuant to Real Property

Law 227-e.

The following exhibits were admitted into evidence: Plaintiff's Exhibit 1 – Notice

to Admit (NYSCEF 29); Exhibit 2 – Sublease (NYSCEF 3); Exhibit 3 – Email

correspondence dated 7/20/20; Exhibit 4 – Sublease with new tenants; Exhibit 5 –

Bills/Invoices (NYSCEF 37); Exhibit 6 – Broker Invoice; Exhibit 7 – Additional Invoices

(NYSCEF  33); and Exhibit 8 – Unsigned sublease dated 1/10/21. The court reserved

1

[* 1]

decision at the conclusion of the trial and ordered the parties to submit Post-Trial Memos and their applications for attorneys' fees by May 22, 2025.

Based upon the testimony and evidence introduced at trial, the court makes the following findings of fact and conclusions of law.

**FACTS**

Plaintiff Mayzone subleased the premises located at 110 Central Park South, Apt 11A, New York, New York to defendants Daniel Kramer and Ellen Kramer (the Kramers) for a term of two years beginning May 1, 2019, and ending April 30, 2021. The Sublease provided for monthly rent of $15,000 payable on the first of the month, a $15,000 security deposit, and an advance payment of $15,000 representing the last month's rent, April 2021. The Covid pandemic struck in 2020. Ellen Kramer vacated the apartment in March 2020 followed by Daniel Kramer, who vacated in July 2020. Defendants failed to make any monthly payments beyond July 2020.

Plaintiff's first witness, Erin McCarthy, is the mother of the minor child, a member of the Plaintiff's LLC, and a shareholder of the proprietary lease for apartment 11A. Ms. McCarthy credibly testified that she learned defendants had vacated in July 2020 in an email dated July 23, 2020, from defendants' attorney Samuel Himmelstein. Ms. McCarthy immediately contacted her real estate broker, Lucie Holt, Ellis Jones, her daughter's executor, and the building manager to inform them that defendants had vacated the unit. Ms. McCarthy communicated via email with defendants' attorney Mr. Himmelstein in August and September in an effort to work out an amicable resolution for the unpaid rent due for the balance of the lease term. Ms. McCarthy credibly testified that, in September 2020, she contacted Mr. Himmelstein to inform him that there was a

2

potential renter for the unit if the rent was reduced to $12,000 per month. It was 3 to 4 days later that Mr. Himmelstein responded to Ms. McCarthy, by which time the potential renter had moved on. Ms. McCarthy testified that it was not until December 2020 or January 2021 that another offer of $8,000 was made on the unit, but that this potential renter also moved on. Ms. McCarthy credibly testified that the apartment was never taken off the market and that she instructed Ms. Holt, the real estate broker, that they would not turn away any offers and to continue listing and showing the unit. Ms. McCarthy testified that, while they received a lower offer in January 2021, they were able to re-rent unit 11A in February 2021 at a monthly rent of $12,000.

Plaintiff next called Lucie Holt, a real estate broker with Compass. Ms. Holt has been a real estate agent for 25 years and is familiar with the rental and sale of real estate in Manhattan. Ms. Holt testified that Ms. McCarthy asked her if she could find a renter for unit 11A after the Kramers moved out of the unit in July 2020. Ms. Holt testified that the unit was listed approximately one month later and explained that, with apartments of this caliber, "you have to make sure it's ready. So we had to have it cleaned, prepared, prepared for photographs and to bring people in the door." She testified that the market in the summer of 2020, in the wake of Covid, was very slow. She explained that, while another unit in the building, 5A, which was on a lower floor and thus had a less desirable view than unit 11A, rented for $15,000, it was only possible to obtain such a high rent for the unit because the renter was a celebrity.

Ms. Holt testified that the listing price for unit 11A was $12,000 for the month of September. Ms. Holt received a call to show the apartment to someone who wanted to pay around $10,000. Ms. Holt reached out to Ms. McCarthy to obtain her permission,

3

[* 3]

which she gave within a day or two, but by that time the potential renter had moved on.

Ms. Holt testified that they had some showings but that the market was "quite slow".

She advised Ms. McCarthy to lower the price of the unit. Ms. McCarthy agreed, and the

list price was lowered to approximately $10,000. Ms. Holt further testified that there was

another offer of $8000 or $9000 in December 2020 or January 2021, which was relayed

to Ms. McCarthy who authorized Ms. Holt to accept it. However, this potential renter too

disappeared. Ms. Holt explained that if a potential renter wants a shorter-term lease,

the monthly charge is more than for a long-term, one-year lease. She explained that,

while the apartment was listed for $10,000, it ultimately rented for $12,000 because the

renters were asking for a shorter lease term. Ms. Holt credibly testified that the unit was

always on the market, that Compass pays a daily monetary rate to host properties on

websites, and that after it leaves Compass the listing goes out to all the brokers and

other websites. As per Ms. Holt, the apartment was listed on all these sites from August

2020 through February 2021.

It is undisputed that defendants did not pay any rent from August 2020 through

the date the apartment was re-rented on February 10, 2021.

**LAW**

Real Property Law 227-e sets forth a landlord's affirmative duty to mitigate

damages where, as here, a tenant vacates the premises before the end of the lease, as

follows:

> [T]he landlord shall, in good faith and according to the landlord's resources
> and abilities, take reasonable and customary actions to rent the premises
> at fair market value or at the rate agreed to during the term of the tenancy,
> whichever is lower. If the landlord rents the premises at fair market value or
> at the rate agreed to during the term of the tenancy, the new tenant's lease

4

[* 4]

shall, once in effect, terminate the previous tenant's lease and mitigate damages otherwise recoverable against the previous tenant because of such tenant's vacating the premises.

The statute further clarifies that the doctrine of mitigation of damages is not an affirmative defense to be asserted by a tenant, but rather the burden is on the landlord to establish it took reasonable and customary actions to "render the injury as light as possible" (*Wilmot v State of New York*, 32 NY2d 164, 168 [1973]).

The court found both Ms. McCarthy and Ms. Holt to be credible witnesses. Ms. McCarthy credibly testified that she immediately contacted defendants' attorney, Samuel Himmelstein, Esq, once she learned that defendants had vacated the unit prior to the end of their lease term. In the interim, Ms. McCarthy contacted her real estate broker, Ms. Holt, who herself credibly testified that that an apartment of this caliber required preparation, cleaning and photographs before showing it to prospective renters, and that the apartment was ready to be shown to prospective renters in mid-August. Ms. Holt was familiar with the premises because she had twice previously rented it, including to the defendants.

Ms. McCarthy communicated with Mr. Himmelstein in September that there was a prospective tenant to rent the apartment at $12,000, which was $3,000 less than the defendants' rent. Several days went by before Ms. McCarthy heard from Mr. Himmelstein, and by that time the prospective renter had disappeared.

Ms. Holt further testified that the apartment was listed on various websites, was never off the market, and was shown to several interested parties. Ms. Holt explained the difference between a short-term rental versus a long-term rental with respect to rental price, that rental prices also depend on the location of an apartment and if a

[* 5]

celebrity wishes to rent an apartment. She further credibly testified that there were several interested individuals who wanted to pay significantly lower rent, ranging from $8,000 to $10,000. These offers were relayed to Ms. McCarthy, who agreed to accept these reduced rental prices, but the potential renters either disappeared or walked away from the deal. Furthermore, as per Ms. Holt, the months of November and December are perceived to be a "quiet period". Plaintiff was finally able to secure a new tenant in February 2021 at a monthly rent of $12,000.

The court finds that plaintiff remained open and willing to negotiate with potential renters even if there were only a few interested parties. The fact that plaintiff did not re-rent unit 11A until February 2021, approximately 5 to 6 months after defendants vacated the apartment, does not mean plaintiff was unwilling to rent the unit for less than the original $15,000 rent amount or the reduced $12,000 rental amount, as evidenced by Ms. McCarthy's credible testimony that she authorized Ms. Holt to accept an offer of only $8,000 or $9,000. It is undisputed that the subject time-period was at the height of the Covid pandemic, and that there was thus reduced demand in the New York City real estate market.

Defendants argue that plaintiff did not offer any incentives to prospective renters, citing *14 E. 4th St. Unit 509 LLC v. Toporek*, 203 AD3d 17 [1st Dept. 2022]. In *Toporek*, despite having advertised a rent for the vacated apartment that was higher than defendant's rent under the lease, the plaintiff/landlord was held to have complied with Real Property Law 227-e based on its unopposed claim that the advertised rent was subject to rent concessions (*id.* at 24). *Toporek* is readily distinguishable, however, as here plaintiff advertised the apartment at a rent *less than* defendants' rent under the

6

[* 6]

lease. To the extent defendants contend the list price was nevertheless inflated relative to the market, it is mere speculation to suggest the apartment would have rented prior to February 2021 had plaintiff offered incentives or rent concessions. It is of no moment that the "new subtenants were a special case," as per defense counsel.

Moreover, defendants provide no credible evidence that plaintiff did not act in good faith or take reasonable steps to locate a new tenant. Indeed, plaintiff secured a new tenant in approximately 6 months, which the court finds to be reasonable under the unprecedented circumstances presented by the Covid pandemic.

Based on the foregoing, the court finds that plaintiff has met its burden of demonstrating that it took reasonable and customary actions to re-rent the unit and mitigate its damages (*see* Real Property Law 227-e; *Toporek*, 203 AD3d at 23-24).

The court finds plaintiff is entitled to the following damages: (a) rent from August 2020 through February 2021 at $15,000 per month, resulting in arrears of $105,000; and (b) shortfall of $3,000 per month for March and April 2021, for a total rental arrears due of $111,000. Defendants are due a credit of $30,000 based on their payment of a $15,000 security deposit and prepayment of $15,000 for the last month's rent, April 2021. Therefore, plaintiff is entitled to recover rental arrears from defendants in the sum of $81,000.

## REQUEST FOR ATTORNEYS' FEES

Plaintiff seeks to recover legal fees incurred in this proceeding, submitting in support the affirmation of its counsel, Steven Sperber, and time records for him and his firm. Mr. Sperber has been practicing law in New York State since 1981 and started his career at Lindenbaum & Young. In 1992, Mr. Sperber started his own firm, Sperber

7

Denenberg & Barany, which later became Sperber Denenberg & Kahan. In 2020, SKH Heiberger was formed, which ceased doing business in 2024 in favor of Sperber Kahan Law Group, PLLC. Mr. Sperber has tried over 1000 cases, including 25 jury trials in Supreme Court, Civil Court, Landlord/Tenant Court and Federal Court, as well as argued appeals in both the Appellate Division and Appellate Term. Mr. Sperber manages the Supreme Court Litigation department of his firm. Mr. Sperber avers that the legal invoices annexed to his affirmation for the attorneys who performed legal services on this matter (*see* NYSCEF 42) were kept in the ordinary course of business, under his control and supervision, and were approved by him. Mr. Sperber explained certain hourly rate discrepancies. The legal invoices from 2020 through 2025 reflect the time spent by Mr. Sperber, Anna Zhou, Esq., Ricardo Vasquez, Esq., Brianna Neyland, Esq., Michelle Hagler, Esq., and Jacqueline Handel-Harbour, Esq in conjunction with the instant litigation and that have been paid to date, not including time spent on the post trial memo. Mr. Sperber's firm's legal invoices total $24,297.85.

The court reviewed the legal invoices and finds that the legal fees due plaintiff, $24,297.85, are reasonable in light of Mr. Sperber's professional experience, that of his law firm, and the litigation.

In light of the foregoing, defendants' request for attorneys' fees in its counterclaim is dismissed.

## REQUEST FOR MISCELLANEOUS EXPENSES

Next, plaintiff seeks to recover its costs of re-renting the apartment, consisting of a brokerage fee in the sum of $10,000, approximately $2,850 in cleaning expenses, $955 for replacement fixtures, a move out fee of $1,000 assessed by the building, and

8

[* 8]

$5,389 for removal of wallpaper and painting, for a total of $20,194 (*see* NYSCEF 37). Paragraph R10(D) of the Sublease states, in pertinent part, that "Undertenant shall be responsible for Overtenant's cost of re-renting[,]" which shall include "the cost of repairs, decorations, broker's fees, attorney's fees, advertising and preparation for renting[,]" and that "Undertenant shall continue to be responsible for rent, expenses, damages and losses."

Plaintiff annexes supporting documentation to substantiate the broker's fee, cleaning expenses, cost of replacement fixtures, and the move out fee. However, with respect to the purported cost of painting and wallpaper removal, the invoice submitted from I.F Painting for $5,389 is an estimate and contains a 2019 date. There is no credible evidence to support that this amount was in fact paid or that these services were performed after defendants vacated the unit.

Based on the foregoing, plaintiff is entitled to recover from defendants the cost of the broker's fee in the amount of $10,000, cleaning expenses in the amount of $2,850, the cost of replacement fixtures in the amount of $955, and the move out fee in the amount of $1,000, for a total sum of $14,805.

Based on the foregoing, it is hereby

**ORDERED** that plaintiff is entitled to recover the following: $81,000.00 as and for rental arrears with statutory interest from August 1, 2020; and it is further

**ORDERED** that plaintiff is entitled to recover $14,805.00 for the combined costs of re-renting the apartment, consisting of the real estate broker fee, cleaning expenses, replacement fixtures, and the move out fee; and $24,297.85 in legal fees for a combined total of $39,102.85 with statutory interest from the date of this decision; and it is further

9

[* 9]

**ORDERED** that defendants' counterclaim for attorneys' fees is dismissed; and it is further

**ORDERED** that the Clerk is directed to enter judgement accordingly.

Any requested relief not expressly addressed herein has nonetheless been considered and is expressly denied and this constitutes the Decision, Order and Judgment of the court.

Dated:     New York, New York
             June 11, 2025

So Ordered:

_____

**Hon. Lynn R. Kotler, J.S.C.**

10

[* 10]